Thomas H. BARNETT, Appellant,

v.

Richard L. "Dick" MATZ, Appellee.

No. 11932.

Court of Civil Appeals of Texas,
Austin.

July 12, 1972.

Sloan, Muller & Godfrey, Cullen M. Godfrey, Austin, for appellant.

Brown, Maroney, Rose, Baker & Barber, Charlie D. Dye, Will G. Barber, Austin, for appellee.

O'QUINN, Justice.

This appeal is from a summary judgment in which the district court decreed that appellant, who was plaintiff below, take nothing in a suit for damages and, alternatively, to enforce a constructive trust on 6.10 acres of land. Appellant's lawsuit was grounded on his claim that appellee had breached a fiduciary relationship between them and deprived appellant of an interest in the land and improvements which appellee acquired with a third party.

The trial court found that based on the entire record there was no genuine issue as to any material fact between the parties and that appellee, as defendant below, was entitled to judgment as a matter of law. We agree with the trial court and will affirm its judgment.

The appellant, Thomas H. Barnett, is a physician who lives in Austin but maintains offices in Round Rock where he owns and operates a nursing home. The appellee is Richard L. "Dick" Matz, a licensed realtor residing and maintaining offices in Austin.

In his petition filed in May of 1971 Dr. Barnett alleged a cause of action purporting to arise "out of personal and confidential information delivered to" Matz by Barnett pertaining to 6.10 acres of industrial property located at 8400 Research Boulevard in Austin. Barnett alleged that he anticipated entering into a partnership with Matz looking toward purchase of the property. Barnett "ceased to pursue his endeavor to purchase" the land after he learned that the property "was not available for purchase." Barnett brought suit upon finding that Matz, several months subsequent to their joint efforts, had acquired an interest in the property with another person as partner.

In moving for summary judgment, Matz assumed the burden of proof that there was no genuine issue as to any material fact and that he was entitled to judgment as a matter of law. Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929, 931 (1952). The rules guiding the courts in determining whether the movant is entitled to summary judgment under Rule 166–A, Texas Rules of Civil Procedure, were stated by the Supreme Court in Great American Reserve Insurance Company v. San Antonio Plumbing Supply Company, 391 S.W.2d 41, 47 (Tex.Sup.1965). In reviewing this record we have followed these precepts, beginning with the requirement that the evidence be viewed in the light most favorable to the party opposing the motion for judgment.

In addition to the pleadings, the parties filed affidavits and deposition testimony from seven witnesses, with more than twenty documentary exhibits.

Dr. Barnett became interested in "outside investments," aside from the nursing home in Round Rock, about 1962, and by 1968 had invested in at least ten real estate properties. Late in 1968, probably early fall, Barnett received a telephone call from William L. Grafton, a salesman with Patterson and Jones, a realty firm in Austin, about the property at 8400 Research Boulevard. Grafton told Barnett the property was available for purchase at a foreclosure sale, notice of which had been posted at the Travis County courthouse.

Barnett called Matz, with whom he had had previous business dealings, and together they visited the property. During the next two weeks they kept in touch with Grafton and in addition made a brief visit to Barnett's banker to learn whether there was a possibility of borrowing money to buy the property and consulted Barnett's attorney regarding possible title defects.

The record shows that R. D. Patterson, of the Patterson and Jones firm, had seen the public notice posted at the courthouse and after calling the trustee whose name appeared on the notice was referred to Harry Holmes, Jr., in Houston.

Patterson's investigation disclosed that the property at 8400 Research Boulevard was owned by Howard T. Cox and James P. Nash of Austin who a number of years earlier had caused to be constructed on the 6.10 acres an industrial building which they leased to W. M. Reese, who was engaged in manufacturing instruments. With the lease, Reese also acquired from Cox and Nash an option to purchase the property at a stated price within a stipulated term of years. Reese had pledged his option to purchase in connection with a loan in

Houston, and Holmes had undertaken to guarantee Reese's obligation. The Houston lender had transferred the Reese note to Holmes, who then was in position to direct foreclosure when the obligation became delinquent. As stated by Patterson in his deposition, the only way at that time for a purchaser to get clear title to the property was by foreclosure, since Reese was beset by "a good many judgments against him," making it expensive and impractical to acquire the property through Reese.

Within approximately two weeks after Grafton called Barnett about the property, Patterson learned that Holmes "had patched up the default" and worked out an extension with Reese and that Holmes had abandoned plans for a foreclosure sale. With this information, Grafton advised Matz and Barnett that the 6.10 acres were no longer available, and thereafter neither Matz nor Barnett made any further attempt to acquire the property.

In October of 1968 Matz entered into a limited partnership with Joe M. Teague, who had business interests in Austin and Houston, Matz becoming the general partner and Teague the limited partner. Earlier, in the summer of 1968, Matz and Teague had constructed an office building on Anderson Lane in Austin where Matz maintained an office, and this venture led to their formation later of Matz-Teague, Ltd.

Early in April of 1969 Matz-Teague, Ltd. acquired an industrial site at 8409 Research Boulevard, in the same block with the 6.10 acres of land but on the opposite side of the boulevard. They purchased the property from W. M. Reese, the owner, who was also the lessee of the Cox-Nash 6.10 acres at 8400 Research Boulevard. In the course of closing the transaction with Reese on the site at 8409, Matz-Teague, Ltd. received a check from Reese for $5,646.52 which was returned by the bank. Matz and Teague went to see Reese in his office at the 8400 address to discuss the returned check.

Both Teague and Reese testified that during that visit Reese made known that he planned to leave Austin and suggested to Teague that he buy the land and building at 8400 Research Boulevard. Upon asking the price and being told Reese would sell for $175,000, Teague at once said he would take the offer and buy the property. It is uncontradicted that the offer was made to Teague alone and that Teague alone accepted. Later Teague took title in his name, after arranging the financing alone, and after Reese had cleared the sale with Holmes in Houston and arranged to exercise his option with Cox and Nash.

Teague suggested to Matz, after arranging interim financing to buy the property in his name, that the building and half the land should be transferred to Matz-Teague, Ltd. Matz and Teague together arranged permanent financing on the property, and the building and half the acreage were conveyed by Teague to the partnership.

It is clear from the record that neither Teague nor Matz knew that Reese was willing to sell the property when they went to see him about the delinquent check. Reese told Teague about his plans to move from Austin, and stated that he did not want the property at 8400 to revert to Cox and Nash by reason of Reese's failure to exercise his option to buy, which would expire within a few months. Reese also suggested to Teague that he buy Reese's residence property in Austin, an offer Teague declined.

Barnett alleged that he delivered "personal and confidential information" to Matz and that there was "created and established a fiduciary relationship" after which "Matz intentionally took the information conveyed to him" and without Barnett's consent negotiated a conveyance of the property to Teague. We find no evidence in the record to support these allega-

tions, and all of the evidence, viewed in the light most favorable to Barnett, demonstrates that there is no genuine issue as to any material fact.

The business relationship between Barnett and Matz in 1968, when for some two weeks they were jointly planning to buy the 6.10 acres at foreclosure sale, terminated abruptly when Holmes decided to "patch up the default" with Reese and called off the foreclosure sale. Both Barnett and Matz, when advised through Grafton that the property could not be acquired because of Holmes' action, ceased to pursue the matter further. It is undisputed that Matz did not know the property would be offered for sale until Matz heard Reese offer the site to Teague in April of the next year, some four to six months after the chance of bidding at foreclosure sale had been removed by Holmes.

Neither Matz nor Barnett went away from their erstwhile plan for a joint venture carrying confidential or secret information acquired by reason of their relationship. The notice of impending foreclosure was a matter of public record, published on the courthouse door. Patterson found it and alerted Grafton who in turn advised Barnett who then called Matz. Other facts relating to the property, such as ownership, leases, options, judgments against individuals, also were matters of public record, available to any person who cared to investigate. Barnett and Matz as partners or joint venturers shared nothing in the way of information that could not have been shared by any other person who might become interested in the property and who was willing to examine the public records.

Barnett and Matz had been acquainted for several years, but none of their previous business was related to or was carried over into the 1968 plan to bid in the 6.10 acres.

The record shows that prior to their brief interest in the 6.10 acres on Research Boulevard in 1968 Matz over a period of several years as a salesman had shown Barnett several pieces of real estate, one of which Barnett bought, and that Matz had tried unsuccessfully to negotiate for Barnett the purchase of a tract adjoining the property Barnett had bought through Matz. While visiting socially, other persons being present, including an architect, Barnett on one occasion introduced the subject of investment in condominiums in Cuernavaca, Mexico, and after the persons present showed an interest, Barnett went to Mexico for a weekend and returned with a prospective investment at Acapulco in lieu of the Cuernavaca deal which was less attractive. As a result of a second visit to Mexico, made by Barnett, Matz and a third person, a condominium at Acapulco was finally purchased, with eighteen investors eventually participating, including Matz and Barnett.

Matz and Barnett also worked out a separate agreement by which they would share commissions Matz might earn by selling other condominiums in Mexico to persons interested in them as an investment or vacation facility. Although brochures were printed and placed in the hands of prospects and with other salesmen, nothing came of the plan and Matz made no sales. Later Barnett invested in a second condominium in Mexico in which Matz did not share. Matz made no further investments in Mexico and also discontinued efforts to sell condominiums in Mexican resort cities.

Barnett on appeal relies on decisions by the Supreme Court which we do not consider controlling under the facts of this case. In Fitz-Gerald v. Hull, 150 Tex. 39, 237 S.W.2d 256 (1951), as Barnett states, the Court "found that when the Defendant took title in his own name *in violation of the original agreement,*" the grantee held title to an undivided one-half interest for the other party to the agreement. (Emphasis added). Matz and Barnett had no such agreement. They simply made a

brief, fruitless sortie with the intention of bidding on property as partners at a public foreclosure sale. Their sally came to a halt when Holmes abandoned foreclosure steps. The record fails to disclose any agreement between Matz and Barnett that they would continue their efforts and that if either of them ever had a chance to buy the 6.10 acres, he would take title for both of them.

Barnett insists that Omohundro v. Matthews, 161 Tex. 367, 341 S.W.2d 401 (1960) ". . . presents a fact situation similar to the case before this Court." We fail to find the similarities upon which Barnett relies. In *Omohundro* the "confidential information" received by Omohundro from the geologists with whom he was associated consisted of technical studies, including a well-log, which Omohundro borrowed from one of his associates to use in negotiating for himself to the exclusion of his associates. The jury found in *Omohundro* that the agreement had not been terminated, and that Omohundro had purposely allowed an oil and gas lease to expire by nonpayment of rentals to further his negotiations with third parties without the knowledge of his associates.

The so-called "confidential information" Barnett compares to that in *Omohundro* consists of information Barnett obtained and imparted to Matz "that land option may be on the market" and that Barnett's lawyer by investigation "knew [the Reese option] to be a valid option." The information that the option might be on the market came originally from the public notice posted on the courthouse door, first seen by Patterson, who after investigation, imparted the facts to Grafton who called Barnett. The lawyer's opinion that the option was valid was based on examination of "run sheets" obtained from an abstract office or from the county clerk's office. The same information was available to any person knowing how to find the courthouse or how to request title information from an abstractor. The record does not disclose that any information Barnett passed on to Matz was confidential, secret, or exclusive in nature. The arrangement between Barnett and Matz was confined to their fugacious plan to bid jointly in hopes of buying the 6.10 acres at a foreclosure sale that never took place. The agreement between Barnett and Matz did not require mutual agreement to effect its termination. Holmes took care of that when he called off the sale.

■ The facts of this case are controlled by principles of law stated in Giddings Convalescent Home, Inc. v. Wilson, 473 S.W.2d 246, 249 (Tex.Civ.App. Austin 1971, writ ref. n. r. e.); Mathis v. Cactus Drilling Corporation, 430 S.W.2d 78, 83 (Tex.Civ.App. Austin 1968, writ ref. n. r. e.); and Collins v. Gee, 107 S.W.2d 754, 755 (Tex.Civ.App. San Antonio 1937, writ ref.). The information Barnett passed on to Matz was not confidential, but was a matter of public record, and certainly cannot be compared to private studies and well-logs made by geologists in an oil field. The fleeting joint venture between Barnett and Matz was without meaning or purpose, and did not survive, after Holmes dropped his plans to foreclose on Reese's option to buy the 6.10 acres. Whatever duties of good faith or fiduciary ties existed between Barnett and Matz during their brief venture also came to an end when Holmes made it impossible for them to bid on the 6.10 acres as they had planned. The venturers were free thereafter to act separately and each for himself without violating any trust or confidence.

■ The fact that Barnett and Matz had dealings with each other prior to their joint interest in 1968 in bidding on the Reese option did not establish a confidential relationship upon which to create a constructive trust in the property for the benefit of Barnett. Consolidated Gas and Equipment Co. of America v. Thompson, 405 S.W.2d 333, 336 (Tex.Sup.1966).

We hold that there is no genuine issue as to any material fact and that Matz is entitled to judgment as a matter of law.

The judgment of the trial court is affirmed.

Affirmed.